Filed 9/30/22  Coleman v. Bradshaw CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DOLORES COLEMAN,<br><br>        Plaintiff and Respondent,<br>v.<br>DREXEL A. BRADSHAW,<br><br>        Defendant and Appellant. | A157968<br><br>(San Francisco County<br> Super. Ct. No. PTR-17-301118) |

Attorney Drexel Bradshaw, as trustee of a trust for the benefit of an elderly client, hired Bay Construction to perform work on the home which was the primary asset of the estate.  The trial court found Bradshaw was a principal and substantial creditor in Bay Construction, the company lacked credible contracting credentials, and Bradshaw actively concealed and misrepresented these facts.  The court removed Bradshaw as trustee for breach of his duties as trustee and intentional misrepresentations to the court in the course of his work as a fiduciary.  On appeal, Bradshaw contends his due process rights were violated because the trial court improperly changed the theory of the case.  He also challenges the trial court's rulings as unsupported by the evidence.  We affirm.

1

## BACKGROUND

### *The Conservatorship and Trust Actions*

Ora Gosey owned a two-unit building in San Francisco; she lived in the upstairs unit and rented the downstairs unit. Following Bradshaw's advice to establish a trust, Gosey hired his law firm to draft the trust instrument, which she signed on January 3, 2007. The trust's principal asset was the residence. Although Bradshaw testified that an associate drafted the trust instrument, the trial court found Bradshaw did so, crediting a 2014 declaration in which Bradshaw stated, " 'Ora [Gosey] and I created her Living Trust.' "

The stated purposes of the trust were to provide for Gosey's care and maintenance, to avoid conservatorship in the event of Gosey's incapacity, and to facilitate transfer of the property upon Gosey's death. Gosey's primary interest was to ensure she could live in peace and comfort in her home.[1]

Article VII of the trust instrument provides: "Except as expressly provided in this document, the Trustee has the duties imposed by law . . . ." Specific "Limitations on Trustee's Duty of Loyalty" are set forth in paragraph B of article VII. Most relevant here, paragraph B.5 of article VII provides, "As long as the Trustee does not act in bad faith or in disregard of the purposes of the Trust, it is not a breach of the Trust for the Trustee to: . . . [e]mploy the Trustee, a relative of the Trustee, or a business in which the Trustee has an interest, to perform needed services for the Trust or any

---

[1] Article III.B. of the trust instrument stated: "In exercising the discretion granted to the Trustee, with respect to payments of trust principal, the Trustee should keep in mind that the health, maintenance, comfort and support of the Settlor are more important to the Settlor than any other purposes of this trust."

business in which the Trust has an interest and pay compensation not exceeding fair market value . . . ."

Gosey was the initial trustee and the trust instrument specified three successor trustees. "Bradshaw & Associates, P.C." was the third, to become trustee if both other successor trustees were unable to act.

In August 2013, Gosey was hospitalized after suffering a fall and medical professionals found she lacked decisionmaking capacity. Bradshaw was appointed conservator of her person and estate (conservatorship action PCN 13-297063), and arranged for her to return home with in-home care. Subsequently, Bradshaw became trustee of Gosey's trust because both of the other successor trustees declined to serve. Bradshaw retained Sheila Robello, an attorney certified as a specialist in probate, trust and estate law, to represent him as conservator and as trustee. The conservatorship assets were transferred to the trust and, in October 2014, the probate court terminated the conservatorship estate. Pursuant to a December 4, 2013 order, the court was to retain jurisdiction over the trust until filing and approval of a trust accounting for the period from December 2, 2013, to November 30, 2014.

Meanwhile, in February 2014, Bradshaw had initiated an action seeking authority as trustee to obtain a reverse mortgage for the benefit of the conservatee (trust action PTR-14-297499), the proceeds of which were used for repairs to the trust property and for Gosey's care. As Bradshaw subsequently detailed in a declaration, the property expenditures included emergency flood repairs following a burst pipe, replacement of a hazardous staircase, foundation repairs, emergency repairs to the tenants' unit, and general maintenance. Bradshaw's accounting for the period December 1, 2014, to May 31, 2016, reflected, and the trial testimony established, that

3

almost all of this work was performed by Juan Gonzalez and Bay Construction, Inc. (Bay Construction). The trust paid Bay Construction over $157,246 during 2015. The parties stipulated that the work done by Bay Construction at the trust property was of professional quality and was billed and paid for at fair market value.

On July 31, 2015, the probate court approved Bradshaw's "First and Final Report and Account of Trustee,"[2] but declined to relinquish court supervision of the trust and directed Bradshaw to file another accounting by August 17, 2016.[3] Bradshaw appealed and Division One of this court reversed the probate court's denial of the request to terminate court supervision, finding the probate court erred in disregarding the December 2013 order.

In August 2016, Bradshaw filed a petition in the conservatorship case for authorization to obtain an additional reverse mortgage. He filed a first supplemental declaration concerning repairs to the property in response to questions from the probate examiner about use of the proceeds from the first reverse mortgage, and subsequently filed a second supplemental declaration when the probate examiner raised questions about Bradshaw's relationship with Bay Construction. Due to concerns about some of the expenditures in the conservatorship and trust, the court appointed counsel Nancy Rasch to represent Gosey. Rasch testified that her primary concern was whether the contractor through whom Gonzalez became licensed was actively supervising work at the trust property, an issue she learned about from the Contractors

---

[2] Bradshaw asked the court to approve his fees as detailed in the report, but stated he was deferring payment to a later date so as not to reduce the amount available for care during Gosey's lifetime.

[3] Coleman had signed a consent to maintain the trust outside court supervision.

4

State Licensing Board (CSLB) and State Bar of California (State Bar), which were conducting investigations at that time.[4]

In October 2016, the court authorized Bradshaw to obtain an additional reverse mortgage, not to exceed $250,000, with use of the proceeds limited to payment of Gosey's care costs and living expenses.

Gosey died on June 16, 2017. In March 2018, the court approved Bradshaw's second and final report in the conservatorship action and terminated the conservatorship of the person.

### *Bradshaw's Involvement with Bay Construction, Inc.*

#### 1. *Formation of the Company*

As noted, questions arose during the proceedings in 2016 about Bradshaw's relationship with Bay Construction and about the company's licensing. Investigations were started by both the State Bar and the CSLB. Factual conflicts regarding these issues form the backdrop for the present case. In a nutshell, Bradshaw testified that, acting as Gonzalez's attorney, he helped Gonzalez form Bay Construction and provided support including loans and use of his law office's resources, but never had an interest in the company or benefitted financially from the company's work. Gonzalez, however, testified that Bradshaw was always a 51 percent owner of the company and made most of the decisions about everyday operations for the company.

Bradshaw first met Gonzalez around 2002 and hired him to do handyman work over the years. In 2014, when Gonzalez was down on his luck and living in his car, Bradshaw wanted to help him and proposed formation of a construction company. According to Bradshaw, he acted as

---

[4] Issues concerning Gonzalez's contractor's license will be discussed further below.

Gonzalez's attorney in this effort, providing gratuitous legal services and "back-office support," although the retainer agreement he had his staff prepare was a "standard fee agreement," not one for pro bono services. Gonzalez testified that Bradshaw proposed helping him start a business in which Bradshaw would be a 51 percent owner and Gonzalez a 49 percent owner. Gonzalez understood Bradshaw to be his business partner, not his attorney. He testified, "I thought [Bradshaw] was preparing the business to then pass it on to me at a later date."

Gonzalez signed a February 4, 2014, retainer agreement in which Bradshaw detailed the services and conditions of his representation of Gonzalez in seeking to obtain a contractor's license. The agreement specified that Bradshaw had agreed to Gonzalez's requests for him to advance costs and "assist you with other personal expenses as a loan to you while you get your new business up and running." The agreement contained a waiver of any potential conflict arising out of Bradshaw's roles as trustee of Gosey's trust and attorney for Gonzalez: "[I]nasmuch as you have in the past and may or may not in the future perform maintenance tasks on behalf of Ms. Gosey, we have discussed and you agree and recognize my duty is to her and I will, in all circumstances protect her interests independent of my desire to assist you in securing your Contractor's license or in any other way. Despite this potential conflict, you knowingly agree to waive that conflict and proceed as discussed. You further agree to grant me a lien on the trust estate, non-trust assets, and any and all claims, cause or action and/or property that are the subject of my representation of you."

Gonzalez testified that he did not understand this to be a retainer agreement and he never hired Bradshaw to be his attorney. Gonzalez, who testified in Spanish with a translator, estimated that he understood English

about "70 percent" and did not read it fluently. He testified that he signed documents Bradshaw presented to him that he did not understand, but conceded he did not tell Bradshaw he did not read English well. Bradshaw acknowledged that Gonzalez was "not that fluent" in reading, writing, and understanding complex topics in English, but said they communicated "well enough" on the matters they discussed.

Bay Construction was incorporated on April 1, 2014. The articles of incorporation were signed by Bradshaw as "incorporator." A statement of information for Bay Construction filed with the Secretary of State on February 4, 2015, lists Gonzalez as chief executive officer (CEO), secretary, and chief financial officer (CFO).

### 2. *Bay Construction's License*

Bradshaw testified that he loaned Gonzalez $1,000 to pay for the class necessary for Gonzalez to get a contractor's license. One of Bradshaw's associates, Nicolet Corliss, helped Gonzalez complete the license application. Gonzalez admitted at trial that he lied about his work experience when Corliss was helping him prepare the application, which requires the applicant to provide certifications of relevant work experience.

Gonzalez's application was rejected. With Bradshaw's assistance, Bay Construction then obtained a license through a licensed contractor, Raymond Invernon, who applied on the company's behalf as its "responsible managing officer" (RMO). (See Bus. & Prof. Code, §§ 7068, 7068.1.) According to Bradshaw, he contacted a consulting company (Ja-Set) that put Gonzalez in touch with Invernon. In a letter dated November 19, 2014, Bradshaw told Gonzalez that Invernon had "agreed to be the RMO for you" and directed Gonzalez to get Invernon's number from "Paul at Ja-Set." The letter stated that Invernon "must be engaged in 'direct supervision and control' of the

work," which "includes any one or any combination of the following activities: supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites."

A check for $1,000 paid by Bradshaw's law firm to Invernon on November 6, 2014, notes Gonzalez as client, and Bradshaw's client accounting for Bay Construction reflects both this and another payment of $1,500 to Invernon on November 20, 2015.[5] The accounting also reflects a $1,430 payment to Ja-Set on October 14, 2014.

Gonzalez testified that he did not call Paul at Ja-Set and never spoke to Invernon. He described Invernon as "the person who loaned their license" and testified, "Mr. Bradshaw commented to me that he was looking for someone and this man offered a discount if he was paid in advance for the year and that's the way that the license was acquired." Gonzalez testified that Bradshaw made the arrangements and paid Invernon. When Bay Construction later discontinued operations, it was Bradshaw who wrote to inform Invernon.

### 3. *Bay Construction's Operations*

Aside from Gonzalez, three people worked for Bay Construction: Bradshaw's 18-year-old son, Colin Grey Bradshaw (Grey);[6] the receptionist

---

[5] Bradshaw's brief states that he loaned Gonzalez the funds to pay Invernon's initial fee, citing page 270 of the reporter's transcript for March 15, 2019. The transcript for March 15, however, ends on page 161; the ending time (4:30 p.m.) and the court's closing remark ("Have a good weekend") indicate there were no further proceedings on that date. The reporter's transcript for March 20 is the only one that includes a page 270, and that page shows nothing related to payments to Invernon.

[6] Bradshaw's son was known as Grey. We refer to him by this name to avoid confusion with his father. No disrespect is intended.

for Bradshaw's law office, Brea Violette; and real estate agent Elizabeth Todd. Grey, who did not have hands-on construction experience, testified that Gonzalez offered to hire him as a helper when Grey mentioned he hated college and was broke. Bradshaw testified that he had nothing to do with Grey being hired and only learned about it after the fact. Gonzalez, however, testified that Bradshaw told him Grey would be working for the company, directed him to train Grey, and determined how much Grey would be paid. Gonzalez testified that Bradshaw also hired Todd; Todd stated in a declaration that Bradshaw referred her to Gonzalez, but Gonzalez hired her.[7]

Bay Construction operated out of Bradshaw's law office. The law office address was used as the company's address, and Bradshaw provided a dedicated telephone line, answered by Violette. Violette described herself as Bay Construction's "manager," with responsibilities including answering phone calls, bookkeeping, billing, and collections for the company.[8] Bradshaw testified that he offered to provide "back-office support" for Bay Construction because Gonzalez was "good at building" but "not so good with paperwork." Bradshaw did not charge Gonzalez or Bay Construction for legal advice or use of his office space and resources.

Bradshaw set up Bay Construction's bank account and was the sole signer on the account; he is described as "president" on the account signature card and associated documents. Bradshaw could not explain why the

---

[7] Gonzalez testified that Bradshaw hired Todd to be "in charge of getting new clients" for the company and, in Gonzalez's opinion, she was not of value to the company. Todd stated in her declaration that Gonzalez hired her as "Business Development Director."

[8] Violette did not appear at trial. The parties stipulated that her testimony at the trial in State Bar Court would be treated as testimony in this trial.

paperwork listed him as president and testified that the signature card did not say this when he signed it.[9] He testified that he opened the account because Gonzalez could not do so due to a "bad check systems report." Bradshaw testified that Gonzalez had a debit card for the account and believed Gonzalez had online access to the account; Gonzalez testified he had neither. Bradshaw testified that he signed checks for Bay Construction at Gonzalez's instruction. Gonzalez testified that he did not know how Bay Construction paid its bills.

Bradshaw's wife opened two American Express accounts for Bay Construction. Bradshaw testified he asked her to do this as a favor to Gonzalez because she had a longstanding relationship with American Express. Gonzalez, Grey, Bradshaw and his wife had cards on this account, and Violette may have as well.[10]

Violette issued checks to Gonzalez and Grey, using a stamp with Gonzalez's signature that was kept at the office;[11] she was "not sure" what the arrangement was for Todd. Gonzalez testified that he was paid hourly,

---

[9] Bay Construction's "Action by Unanimous Written Consent," signed by Gonzalez as "sole director" in April 2014, provided for establishment of a corporate bank account by "the President, Secretary, and Treasurer or their designee." Gonzalez testified that he did not understand what this document was when he signed it.

[10] Violette testified it was "possible" that the American Express card she used to order construction supplies for Gonzalez was in her name.

[11] Bradshaw testified that the stamp of Gonzalez's signature was kept in Bradshaw's office for use when something needed to be signed and Gonzalez was not present, and that he would always get Gonzalez's permission before using the stamp. Gonzalez, when asked if he knew whether the stamp was used, testified, "I believe so because I've seen documents where that stamp is on them." The stamp differed from Gonzalez's written signature, which is bigger and written at an angle.

Bradshaw determined his rate of pay, and he turned his hours in to Bradshaw.

Gonzalez testified that he prepared estimates for jobs, but Bradshaw decided on the charges and dealt with invoices and payments.[12] Bradshaw testified that he was not involved in preparing invoices for Bay Construction; according to both him and Violette, Violette prepared the invoices with input from Gonzalez.

Gonzalez, Grey, and Violette had regular meetings at Bradshaw's office. Gonzalez testified that Bradshaw attended these meetings. Bradshaw testified he mostly did not attend them, Grey testified that Bradshaw might have walked in occasionally but was not a participant, and Violette testified that her meetings were with Gonzalez and Grey.

Bradshaw had a Bay Construction e-mail address, which he testified was because he "interacted with vendors from time to time."

Gonzalez testified that Bay Construction did jobs for Bradshaw's mother-in-law, Bradshaw's wife's grandmother and a few others, but its largest jobs were for the trust property. Bradshaw testified that he attempted to obtain other bids for the work at the trust property but did not get responses from other contractors, while Gonzalez always did what was

---

[12] After Gonzalez testified that Bradshaw decided what the final bid would be for a particular job he was questioned about, Gonzalez was asked why Bradshaw's name was not on the paperwork if he made most of the decisions. Gonzalez testified, "when we started the company, he would bring me documents to sign when we realized that I wasn't going to be able to apply for a license under my name. [¶] The only thing that I saw in the first page of those documents was my name, not his name. And I had commented to my then wife that probably he was such a good person that he was going to get everything running with the company and then give it to me."

needed.  He testified that Bay Construction turned down better paying larger jobs because of work it was doing for the trust property.

Over time, Bradshaw advanced or loaned Bay Construction $50,000 to $60,000; he testified that $30,000 had been repaid.  Asked if, given the loans, he had a "vested interest in Bay Construction's success," Bradshaw replied that he "didn't want to not get repaid" but had been taught long ago that "if you're going to lend money to someone, you have to treat it in your mind as a gift because it may very well end up being that."  He did not tell Gonzalez to treat the loans as gifts.  Gonzalez testified that he was not aware Bradshaw made a loan to Bay Construction.

### 4. *Indicia of Gonzalez's Ownership of Bay Construction*

Gonzalez signed under penalty of perjury a number of documents stating he was the owner of Bay Construction.

His initial, unsuccessful application for a contractor's license indicated he owned 100 percent of Bay Construction.  At trial, Gonzalez testified that he submitted this application at Bradshaw's request; he acknowledged he was not positive about this but said he would not have been able to do it without guidance because he did not know about "these kinds of documents."

Gonzalez's successful application for a contractor's license stated he was the company's owner, president, secretary, and treasurer.  A federal tax form stating the company's election to be an "S corporation" lists Gonzalez as the sole shareholder and was signed by Gonzalez as CEO in January 2015.  The company's "Business Registration Application," filed with the City and County of San Francisco Treasurer and Tax Collector Office in January 2015, was also signed by Gonzalez as CEO.  Gonzalez stated in a declaration signed in March 2016 that he was the "CEO and sole shareholder of Bay Construction."

12

**5.** *The End of Bay Construction*

Gonzalez stopped working for Bay Construction after December 2015. He testified that he had to leave because Bradshaw "decided not to pay [him]" for the last two months, he had bills to pay, and he and Bradshaw had a verbal deal that Gonzalez would not accept side jobs if he was working with Bradshaw. Gonzalez also testified that he could not continue with the company for ethical reasons, because Bradshaw wanted him to initially give a client only "basic information," then after securing the contract, make changes that would cost the client more money.

Bradshaw testified that Gonzalez "went MIA" in December 2015 and Bradshaw believed he was doing jobs independent of Bay Construction. In January 2016, Bradshaw wrote to Invernon that Bay Construction was discontinuing operations.

A statement of information for Bay Construction was filed with the Secretary of State on January 7, 2016, listing Violette as CEO, secretary, and CFO and indicating it was completed by Violette. Bradshaw testified that he did not know about this at the time, and that Violette "apparently" took seriously something he had said in jest: When the form was due and Violette asked who to list in these positions, Bradshaw was "pretty peeved" about Gonzalez and told her he had no idea and she could put herself "for all I care." Violette testified in the State Bar trial that she did not remember how her name came to be used and did not remember filling out the paperwork or filing it, but it was possible she did so. She recalled there being a joke about her being the CEO after the form was filed, but she became worried about liability and asked Bradshaw to remove her name.

On March 17, 2016, Bradshaw had another statement of information filed, identifying Gonzales as CEO, secretary, and CFO, and Gonzalez's home

address as the company's address. Gonzalez was listed as the person who completed the form and Bradshaw testified that someone in his office used the stamp for Gonzalez's signature, at Gonzalez's direction, after Gonzalez told Bradshaw on March 14 or 15, 2016, that he wanted to "do his own thing." Bradshaw stopped providing active back-office support for Bay Construction around March of 2016.

By this time, the State Bar had begun an investigation into Bradshaw's conduct with respect to the trust and Bay Construction. In a March 2016 declaration prepared by Bradshaw's attorney, Gonzalez stated he was the sole shareholder of Bay Construction and Bradshaw never had any interest in the company and never profited from it.[13] When the State Bar investigator wanted to discuss the declaration with Gonzalez due to concerns about whether he understood it, Bradshaw referred Gonzalez to Peter Hadiaris, an attorney who did contract work for Bradshaw's firm and for a time was "of counsel," with an office in Bradshaw's suite. Hadiaris testified that Gonzalez "clearly understood the written English"; he had Gonzalez translate the declaration into Spanish, watching him handwrite the translation on the first half of the first page, then having Gonzalez take it to complete because Gonzalez was pressed for time. Gonzalez did not recall whether it was Bradshaw or Hadiaris who told him to translate the declaration into Spanish, as both were in the office and both spoke to him about the translation.

---

[13] This declaration additionally stated, among other things, that Gonzalez asked Bradshaw, as his attorney, to prepare the paperwork necessary for incorporation, that Bradshaw allowed him to use his law office for meetings without compensation, and that Gonzalez hired Grey Bradshaw, who had "significant experience and training to draft residential plan sets and was particularly adept at permit expediting, thus enabling my company to avoid delays at the Department of Building Inspection."

Gonzalez acknowledged signing the declaration under penalty of perjury, testifying, "I made a mistake, but yes, I did."

Hadiaris also represented Gonzalez in connection with an investigation by the Contractors State Licensing Board (CSLB) on a matter that had been referred by the State Bar concerning Bay Construction's billing on a job for a client Bradshaw had referred to the company. Hadiaris testified that during a conference call with a CSLB investigator in August 2016, the investigator asked about Bradshaw's role at Bay Construction and who owned the company. Gonzalez said he was the owner.

Bradshaw testified that he had initially represented Gonzalez when the CSLB began its investigation, then referred him to Hadiaris when it was recommended that Gonzalez have a different attorney. Gonzalez, when shown e-mails indicating Bradshaw was acting as his attorney in the CSLB matter and a letter from Gonzalez to the investigator so stating, testified that what the letter said was not true.[14]

### State Bar Disciplinary Proceedings

In October 2017, a disciplinary proceeding was instituted against Bradshaw in the State Bar Court. After a trial, the court on August 30, 2018, issued its decision finding Bradshaw culpable of three of the five counts of misconduct: engaging in a scheme to defraud the trust and its beneficiaries, violating his duty of loyalty and duty to avoid conflicts of interest as trustee;

---

[14] In August 2016, Gonzalez received an e-mail from a CSLB investigator asking to speak with him about his "business arrangement" with Bradshaw, which he forwarded to Bradshaw. Bradshaw, advised Gonzalez "as your attorney" not to respond to any communication from the CSLB, saying he would handle it, and Gonzalez replied that he would let Bradshaw know of any communication he received. The letter Gonzalez signed said he had retained Bradshaw to represent him, but Gonzalez testified, "That is not true, because I did not retain you. You wrote this letter up. I signed it."

and intentionally or with gross negligence making misrepresentations including that there was no relationship or affiliation between himself and any agent he hired and that he had no financial interest in Bay Construction.[15] The court recommended that Bradshaw be disbarred and placed him on involuntary inactive status (Bus. & Prof. Code, § 6007, subd. (c)(4)) pending action by the California Supreme Court.

Both Bradshaw and the Office of Chief Trial Counsel of the State Bar appealed and, in an opinion filed on July 30, 2019, the Review Department of the State Bar Court (Review Department) found the evidence did not establish Bradshaw engaged in any of the alleged misconduct and dismissed the proceeding with prejudice. The Office of Chief Trial Counsel of the State Bar filed a petition for review in the California Supreme Court. On January 2, 2020, the Supreme Court granted the petition, remanded the matter to the Review Department for reconsideration in light of the June 14, 2019, amended statement of decision in the present case, and directed the Review Department to consider whether to return Bradshaw to inactive status pending its reconsideration. On February 24, 2020, the Review Department abated the case pending resolution of the present appeal and ordered Bradshaw enrolled involuntary inactive, pending reconsideration pursuant to the Supreme Court's remand order.[16]

---

[15] Two counts, misappropriation and engaging in the business of a contractor without a license, were dismissed.

[16] At trial, the court denied Coleman's request for judicial notice of the State Bar Court trial findings, proceedings and judgment, finding they were not relevant. The court denied Bradshaw's request to exclude all references to the State Bar proceedings.

We denied Bradshaw's request to take judicial notice of the Review Department's opinion, which had been issued subsequent to judgment in the present case.

### The Present Proceedings

The present case began when Dolores Coleman, a beneficiary under Gosey's trust, filed a petition to remove Bradshaw as trustee on August 10, 2017, followed by an amended petition filed on November 7, 2017. The first amended petition alleged that Bradshaw engaged in a scheme to defraud the trust by the "ruse" that the trust property required repairs, including requesting a reverse mortgage to obtain funds to pay Bay Construction, which it alleged "was in fact, Drexel Bradshaw." The petition sought to subject the trust to the supervision of the court, remove Bradshaw as trustee, appoint a temporary trustee, obtain relief for breach of trust (Prob. Code, §§ 16420, 17200), recover double damages for property wrongfully taken in bad faith (Prob. Code, § 859), surcharge Bradshaw for the wrongfully taken property (*id.*, § 17200, subd. (b)(12)), and object to the trustee's account.

In December 2017, in light of the ongoing State Bar disciplinary proceeding, the court suspended Bradshaw as trustee and ordered him to deliver the trust assets and property to Scott Tolstad, a private fiduciary appointed as temporary trustee. Tolstad's major action as temporary trustee was to sell the trust property.[17]

After trial, the court concluded that Bradshaw breached the trust by repeatedly engaging Bay Construction, "an unqualified contractor in which

---

[17] The title company identified a number of liens for debts owed by Bradshaw, unrelated to the trust, which needed to be cleared before the property could sell. At some point before the close of escrow, Bradshaw wrote to Tolstad's attorney, suggesting that the amount of the liens be subtracted from fees he was owed, but Tolstad testified he never heard this offset offer. Ultimately, the liens were paid with proceeds from sale of the property, thus reducing the net proceeds to the trust. The trial court rejected the claim that Bradshaw breached the trust by failing to take reasonable corrective action after being informed that liens for his personal debts were burdening the trust property.

Bradshaw had a substantial interest," to perform work at the trust property, and did so "without competitive bids to ensure Bay Construction and only Bay Construction secured the work and obtained the substantial remuneration from the trust that allowed Bay Construction to satisfy in substantial part of its debt to Bradshaw [*sic*]." The court found that Bradshaw was "a principal and substantial creditor" of Bay Construction, knew the company lacked "credible contracting credentials" and "actively conceal[ed] from the court and misrepresent[ed] his interests, Bay Construction's lack of credentials, and the no-bid status of the work." Based on the breach of the trust and Bradshaw's intentional misrepresentations to the court in the course of his fiduciary work for Gosey, the court removed Bradshaw as trustee. Bradshaw's motions for a new trial or to reopen evidence were denied, and this appeal followed.[18]

## DISCUSSION

## I.

### *Standard of Review*

Bradshaw maintains the trial court's decision to remove him as trustee is subject to de novo review because it was premised on interpretation of the trust, which is a question of law (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73). To the extent the decision involves factual questions, Bradshaw sees it as a mixed question of law and fact requiring "critical consideration, in a factual context, of legal principles and their underlying values," and therefore "predominantly legal." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [classification of personal property

---

[18] The court filed its statement of decision and judgment after trial on April 18, 2019. After denying Bradshaw's motions for new trial or to reopen evidence, the court filed its amended statement of decision on June 14, 2019, and its amended judgment on July 5, 2019.

18

as fixture for purposes of taxation reviewed independently]). Coleman, by contrast, argues the crucial question underlying this appeal is whether the trial court erred in finding Bradshaw breached his fiduciary duty by acting in bad faith, which is primarily a factual issue reviewed under the substantial evidence standard. (*Penny v. Wilson* (2004 123 Cal.App.4th 596, 603 [determination that trustee acted in accordance with duties reviewed for substantial evidence].)

Bradshaw's description of the standard of review ignores the extent to which the trial court's decision was based on disputed factual issues. To be sure, interpretation of the trust instrument is a question of law and the court's decision rested on its interpretation of article VII.A.B.5. But that provision is unambiguous: As the trial court recognized, the trust permitted "[e]mploy[ing] . . . a business in which the Trustee has an interest, to perform needed services for the Trust" for compensation not exceeding market value "[a]s long as the Trustee does not act in bad faith or in disregard of the purposes of the Trust." There was no dispute at trial that self-dealing was permissible under these conditions, and no dispute that Bay Construction was not paid more than market value. The dispute was whether Bradshaw acted in bad faith. Bradshaw's own arguments on appeal demonstrate that this dispute was factual: Bradshaw argues the bad faith finding should be reversed because the evidence does not support the factual findings underlying it. As to these issues, the substantial evidence standard governs our review. (*Penny v. Wilson, supra,* 123 Cal.App.4th at p. 603.)

## II.

### *The Trial Court Did Not Improperly Change the Theory of the Case*

Bradshaw contends he was denied fundamental due process rights when Coleman "pled one case, tried a different case, and the court ruled on a

theory known only to the court and unsupported by any theory of law." In his view, Coleman's petition alleged a scheme to defraud the trust of the approximately $157,000 paid to Bay Construction under the ruse that the trust property needed repairs, but the case "suddenly and dramatically shifted" when Coleman stipulated at the outset of trial that Bay Construction's work on the trust property was of professional quality and billed and paid at fair market value. The parties at this point agreed that the issues for trial were whether Bradshaw breached his duties as trustee by failing to disclose his alleged ownership of Bay Construction or acting in bad faith regarding self-dealing, and whether he should be removed as trustee.[19] The trial court, according to Bradshaw, went beyond the issue of whether he "owned" Bay Construction to find he breached the trust because he had a "substantial interest" in the company in that he was an unsecured creditor and a company principal, he maintained "significant control over the company, its resources, its employees and the work it did," he "set Bay Construction's prices and controlled cash flow," and the company's operations were "substantially intertwined with" the operations of his law firm.

Bradshaw contends the court "unilaterally and secretly changed [Coleman's] allegation," in violation of the "principle of party presentation." Under the party presentation principle, parties "frame the issues for decision" while courts take "the role of neutral arbiter of matters the parties present" (*Greenlaw v. United States* (2008) 554 U.S. 237, 243) and " 'normally decide only questions presented by the parties.' " (*United States v. Sineneng-Smith* (2020) ___ U.S. ___, 140 S.Ct. 1575, 1579 (*Sineneng-Smith*), quoting *United*

---

[19] The identified issues included Bradshaw's alleged bad faith with respect to the liens against the trust property for Bradshaw's personal debts, and whether they constituted damages to the trust. These issues are not involved in the present appeal.

*States v. Samuels* (8th Cir. 1987) 808 F.2d 1298, 1301.) Bradshaw claims he was prevented from having a fair trial because the court decided an issue not raised by the parties, despite the court's awareness of the "impropriety of deciding issues not before it" as expressed in its comment (in another context) that identification of the issues to be determined in a proceeding is " 'a basic due process matter for the parties.' "[20]

The trial court's decision does not reflect the kind of change in issues discussed in the authorities Bradshaw cites. In *Sineneng-Smith*, the defendant immigration consultant was convicted of federal offenses based on having assisted clients applying for a labor certification with the goal of obtaining lawful resident status despite her knowledge that the clients did not meet a filing deadline and the applications could not lead to lawful resident status. (*Sineneng-Smith, supra*, 140 S.Ct. at p. 1578.) On appeal, as in the trial court, the defendant argued the statute under which she was convicted did not cover her conduct and, if it did, violated the petition and free speech clauses of the First Amendment. (*Ibid.*) The Court of Appeal named and invited briefing and argument from amici curiae on issues the defendant had not raised, including whether the statute of conviction was overbroad under the First Amendment, then found the statute constitutionally overbroad. (*Ibid.*) *Sineneng-Smith* held the appeals court

---

[20] The quoted comment by the court was in reference to the scope of the trial for which the case had been sent from the probate department to the trial department—specifically, whether the trial was to resolve the question issue of removal of Bradshaw as trustee, or that issue was to be returned to the probate department after determination of other issues. The court observed, "I would hope that when you are sent out for a trial from the probate court, at least there's an understanding . . . between the parties what you are being sent out for," and observed that with a broad petition it was important to identify the issues to be resolved in the trial department. (See Super. Ct. S.F. County, Local Rules, rule 14.5.E.)

"departed so drastically from the principle of party presentation as to constitute an abuse of discretion" by electing not to address the defendant's arguments, which "hom[ed] in on her own conduct, not that of others," and instead "project[ing] that [the statute] might cover a wide swath of protected speech, including political advocacy, legal advice, even a grandmother's plea to her alien grandchild to remain in the United States." (*Id.* at pp. 1578, 1581.)

In *Greenlaw v. United States*, *supra*, 554 U.S. 237, the issue was whether the Court of Appeals, "acting on its own initiative, [could] order an increase in a defendant's sentence." (*Id.* at p. 240.) The defendant had appealed his 442-month sentence, arguing it was unreasonably long. The court rejected his arguments, then determined that the applicable law required a sentence 15 years longer than what the trial court had imposed. (*Ibid.*) The trial court had erred, but the government had not filed a cross-appeal. (*Id.* at pp. 241–242.) *Greenlaw* held that ordering the increased sentence in the absence of a cross-appeal by the government violated the party presentation rule and rule that an appellate court "may not alter a judgment to benefit a nonappealing party." (*Id.* at pp. 243–244.)

The trial court here did not cause any such "radical transformation" of the case. (*Sineneng-Smith*, *supra*, 140 S.Ct. at p. 1581.) Coleman sought a ruling that Bradshaw violated his duties as trustee by failing to disclose interests in Bay Construction that compromised his duty of loyalty and engaging in self-dealing by hiring Bay Construction to work on the trust property. As earlier described, article VII.B.5 of the trust allows the trustee to hire a company in which he or she has an interest only "[a]s long as the Trustee does not act in bad faith or in disregard of the purposes of the Trust." Coleman acknowledged at trial that her claims were not based on the fact of

Bradshaw's interest in Bay Construction but on his alleged bad faith and failure to disclose his relationship with the company.

Bradshaw complains that Coleman alleged only that he was required to disclose his *ownership* interest. But the petition was broader than that. It alleged that Bay Construction "was in fact" Bradshaw, with allegations including that Bradshaw incorporated the company; the company was located in the same office as Bradshaw's legal practice; Bradshaw established its checking account with himself listed as president; and Bradshaw's wife's American Express card or account paid for Bay Construction's enrollment with the Better Business Bureau, "naming Drexel Bradshaw as principal of Bay Construction." The petition alleged that Bradshaw breached the trust by conduct including "[f]ailing to disclose his ownership interest or managing interest in Bay Construction."

The parties' discussion with the court about issues to be tried, as Bradshaw emphasizes, referred frequently to his interests as "ownership" interests; he points out that the term "principal" was never mentioned. But Coleman's counsel confirmed the issue was nondisclosure of Bradshaw's "ownership and control." Bradshaw's complaint that the term "principal" was not defined by the court in its decision or the parties in their briefs is unpersuasive. The trial court was obviously using the term in its commonly understood sense of "a person who has controlling authority" (Merriam-Webster Dict. Online <https://www.merriam-webster.com/dictionary/principal> [as of Sept. 30, 2022]). This is evident from the court's statement of decision: "Bradshaw was also a company principal. He maintained significant control over the company, its resources, its employees and the work it did. He set Bay Construction's prices and controlled cash flow. Bay Construction's operations were substantially intertwined with the operations

23

of Bradshaw's other business, his law firm." The court found Bradshaw was a company principal based on his "significant control over the company, its resources, its employees and the work it did," concluding that "Bradshaw's interest in, and involvement with Bay Construction was so pervasive that the company would not have existed without him.

In the context of the issue presented to the court—whether Bradshaw breached the trust by acting in bad faith with respect to hiring Bay Construction to work on the trust property, despite the provisions of article VII.B.5 of the trust instrument—it is impossible to conclude Bradshaw's trial was unfair due to the trial court framing its decision as based on Bradshaw's "substantial interest" in and "significant control" over the company as opposed to his "ownership" of it.

## III.

### *The Trial Court Did Not Err in its Response to Bradshaw's Claim of Discovery Abuse*

Bradshaw contends the trial court erred in permitting Coleman to introduce evidence she intentionally withheld during discovery and denying Bradshaw an opportunity to present opposing evidence.

One of Bradshaw's motions in limine, filed on March 6, 2019, asked the court to exclude evidence not produced in discovery. He asserted that after producing no documents and identifying four witnesses (Bradshaw, his wife, Brea Violette, and Nicolet Corliss) during discovery, then affirming on February 25, 2019, that she had no additional information and her prior responses remained correct and complete, Coleman three days later filed witness and exhibit lists identifying 11 witnesses and 76 exhibits. Bradshaw's motion argued that if Coleman had properly and truthfully responded in discovery, Bradshaw could have deposed additional witnesses

24

and gathered evidence to rebut Coleman's evidence and witnesses. The court denied the motion.

The full extent of Bradshaw's argument on appeal is simply an assertion that the court rewarded Coleman's "gamesmanship and perjury" and Bradshaw was "deeply prejudiced by [Coleman's] dishonest, yet verified, supplemental discovery."

When the matter was discussed in the trial court on March 12, 2019, Bradshaw argued he "might" have taken more depositions if he had known additional witnesses were going to be called; he stated that he had noticed Gonzalez's deposition and took it off calendar in part because Coleman did not identify Gonzalez as a witness. Coleman's attorney argued there was no surprise to Bradshaw because the documents and information enabling Coleman to identify witnesses all came from the State Bar proceedings, and noted that Bradshaw had deposed Gonzalez in the State Bar proceeding, which was based on the same facts. The court rejected counsel's assertion that there was no duty to update discovery if there was no surprise, but stated it was not inclined to exclude the evidence because it was "having trouble seeing a lot of surprise" in the circumstances of this case.

Critically, the court went on to tell Bradshaw, "if you want to ask for a continuance, you should ask the PJ for a continuance because of discovery issues. [¶] If you can identify a specific person who you want to depose, then I may order that deposition to happen during this proceeding. [¶] But I want to know that sooner rather than later, and I want you to set that up sooner rather than later. [¶] So you need to meet and confer tonight on this about the witnesses, who they are. And we talked about who they were and what they were going to testify to. [¶] Any issues about, you know, insufficient or

25

nondisclosure, Mr. Bradshaw, you should raise with [Coleman's counsel]. And then we'll go from there tomorrow."

The record on appeal does not include reporter's transcripts for March 13 or 14, or a minute order for March 13. The minute order for March 14 reflects the court's ruling that "nothing will be excluded due to discovery issues."

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) " '[The appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' " (*Id.* at p. 609, quoting *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.) In addition, " '[a]ppellate briefs must provide argument and legal authority for the positions taken.' (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.) 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.)" (*In re A.C.* (2017) 13 Cal.App.5th 661, 672.)

The record on appeal indicates the trial court believed there was no basis for Bradshaw to be surprised by Coleman's recently disclosed witnesses or her documentary evidence, but suggested steps Bradshaw could take if he felt the need. Bradshaw offers us neither argument nor citation to the record demonstrating he sought a continuance or opportunity to depose additional witnesses. If he did not pursue these measures suggested by the court, he

does not explain why. In these circumstances, his conclusory claim that he was prejudiced and prevented from countering Coleman's evidence is untenable.

## IV.

### *The Trial Court's Factual Findings Are Supported by Substantial Evidence*

Bradshaw contends the trial court erred in finding he breached his duties to the trust because the evidence does not support the court's findings that Bradshaw was an owner or principal of Bay Construction, that he had a significant interest in the company due to his loans, that Bay Construction did not have a credible contractor's license, that Bradshaw improperly hired Bay Construction without obtaining competitive bids, and that he acted in bad faith.

As we have said, "[a] ruling by a trial court is presumed correct," the "burden of demonstrating error rests on the appellant," and we review factual findings for substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631–632.) Under the familiar standard, " 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

" ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] "Substantial evidence . . . is not synonymous with 'any' evidence." . . .

[Citations.] The focus is on the quality, rather than the quantity, of the evidence.' (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) 'It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.' (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) Consequently, we do not evaluate the credibility of the witnesses. (*Lenk v. Total–Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) Rather, 'we defer to the trier of fact on issues of credibility.' (*Ibid*.) [¶] 'Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn.' (*Howard*[, at p.] 631.)" (*Estate of O'Connor* (2017) 16 Cal.App.5th 159, 163–164.)

### Bradshaw's Interest in and Control Over Bay Construction

Bradshaw contends the "great weight of the evidence" shows he was not a principal or owner of Bay Construction and did not control it, as the only evidence he was an owner or principal was Gonzalez's self-serving testimony and there was abundant evidence Gonzalez was the sole owner of the company. As to the latter, Bradshaw emphasizes the many documents Gonzalez signed, under penalty of perjury, stating he was the sole owner of Bay Construction. Additionally, Bradshaw points to an e-mail he sent Gonzalez after Bay Construction was incorporated, saying "You are incorporated!" Bradshaw also relies on an e-mail from a prospective client asking Gonzalez if he was interested in a job, which Gonzalez forwarded to Bradshaw, saying "I need your opinion and your recommendation how to reply to this [person], is [it] worth it?" Bradshaw urges that this e-mail shows Gonzalez was seeking business advice, not "asking his boss for

28

permission." He further argues that the trial court failed to address or consider testimony supporting his contention that he was not an owner or principal of Bay Construction and did not control the company—his own testimony and that of Grey and Violette, who portrayed Gonzalez as the person in charge of Bay Construction, and the declaration of Todd, who stated her belief that Bradshaw did not own or have a financial interest in the company.[21]

Gonzalez, as described above, testified that he understood Bradshaw to be his business partner, not his attorney, and believed Bradshaw was helping him start a company in which Bradshaw would be the 51 percent owner and Gonzalez the 49 percent owner. He testified that Bradshaw made most of the decisions about everyday operations for the company, including determining what clients would be charged and handling invoices and payments; that Bradshaw decided who would work for the company and what each would be paid, including Gonzalez, who was paid hourly and turned in his hours to Bradshaw; and that Gonzalez did not have access to the company's bank account, did not know Bradshaw made loans to the company and did not know how the company paid its bills. Gonzalez testified that he did not understand the retainer agreement and other documents he signed at Bradshaw's direction. Asked why, if he was an owner of Bay Construction, he could not take jobs in the name of the company without Bradshaw's involvement, Gonzalez testified, "from the beginning, I just had to follow

---

[21] Todd declared that, to her knowledge, Bay Construction was wholly owned by Gonzalez, Bradshaw had no ownership or financial interest in the company and did not receive payment for any work Todd did for the company, and Bradshaw provided back office support to Gonzalez and the company free of charge.

Mr. Bradshaw's instructions. He was the one who did everything and so I just had to do what he said."

Bradshaw challenges the credibility of Gonzalez's testimony by arguing that the first time Gonzalez ever told anyone that Bradshaw owned 51 percent of Bay Construction was in 2017, when Gonzalez met with CSLB and district attorney investigators and knew he was under investigation for misuse of his license. Bradshaw also asserts that Gonzalez's testimony was inconsistent in that he testified at the State Bar trial that his wife was the only person he had told about Bradshaw's ownership interest prior to 2017, but at the present trial, testified that prior to 2017 he had told "everyone [he] knew." Emphasizing his view that Gonzalez changed his story about the ownership of Bay Construction only when he realized he faced liability, and specifically referencing Gonzalez's admission that he lied about his work history when Bradshaw's associate helped him prepare his second application for a contractor's license, Bradshaw argues the trial court erred in taking "the testimony of an admitted liar . . . over that same liar's repeated attestations to the contrary, along with all other evidence and testimony presented at trial."

Bradshaw would like us to accept that Gonzalez dishonestly claimed Bradshaw owned 51 percent of the company only after Gonzalez was faced with a criminal investigation into the company, thus demonstrating the falsity of his trial testimony that Bradshaw controlled Bay Construction and that Gonzalez signed the documents stating he was the sole owner of the company at Bradshaw's direction, without full understanding of what he was signing. Bradshaw argued these issues below, but the trial court did not find them persuasive. To the contrary, the trial court found *Bradshaw* lacked credibility: With respect to Bradshaw's assertions that he provided legal

services and office support to Gonzalez but had no financial interest in Bay Construction or role in its operations, the court's statement of decision repeatedly states that Bradshaw "lied about many of the facts discussed herein and omitted other material facts," "lied to the court in the course of these related proceedings," "misstated a number of material facts and omitted many others," and was "dishonest on material matters," as well as that Bradshaw was "not credible" in testifying that his loans to Bay Construction did not amount to an interest because he treated them as a gift.

The trial court's statements rejecting Bradshaw's assertions demonstrate that it largely accepted Gonzalez's testimony: The court stated that Bradshaw "testified he had no financial interest in Bay Construction, knowing that he, in fact, had a significant financial interest in the company. [Citation.] He testified that Gonzalez was '*the* [company] principal' [citation], knowing that, at best, Gonzalez was a principal *along with Bradshaw.* He testified that Gonzalez hired Grey Bradshaw and that he (Bradshaw) played no role in the decision [citation], knowing otherwise. He suggested that Gonzalez prepared the company's bids for the Gosey work [citation], knowing that he controlled the 'bidding' process, what there was of one. He claimed that he sought competitive bids [citation], knowing that no one made any substantial efforts on this front. He testified that Bay Construction was licensed by the CSLB [citation], knowing the purported license was a sham."[22]

---

[22] This portion of the statement of decision was addressing the second supplemental declaration Bradshaw submitted to the probate court. The remarks quoted in the text are the court's elaboration of its statement that "[i]n the course of purportedly 'provid[ing] the court with additional information on the contractor hired to perform repairs [at the Trust Property]' [citation], Bradshaw misstated a number of material facts and omitted many others."

Bradshaw, in effect, asks us to infer *as a matter of law,* that Gonzalez lied in his testimony at trial. We cannot do so.

As we have said, the substantial evidence standard that guides our review of factual questions requires us to defer to the trial court's assessment of witnesses' credibility. (*Lenk v. Total–Western, Inc., supra,* 89 Cal.App.4th at p. 968.) "The trial court is better positioned to weigh the evidence and make credibility determinations; 'we have nothing but the cold, unadorned words on the pages of the reporter's transcript.' (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 749.) 'The cold record cannot give the look or manner of the witnesses; their hesitations, their doubts, their variations of language, their precipitancy, their calmness or consideration. A witness may convince all who hear him testify that he is disingenuous and untruthful, and yet his testimony, when read, may convey a most favorable impression.' (*Maslow v. Maslow* (1953) 117 Cal.App.2d 237, 243.)" (*In re White* (2018) 21 Cal.App.5th 18, 29.)

Moreover, while the testimony of a single witness may be sufficient to constitute substantial evidence (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 611–612), the trial court's conclusion that Bradshaw was a principal of, and had a significant interest in, Bay Construction is supported not only by Gonzalez's testimony but also by circumstantial evidence. This evidence includes the fact that the company operated out of Bradshaw's law office, using its resources; Bradshaw's receptionist was Bay Construction's "manager," answering phones, preparing invoices, ordering supplies, and handling bookkeeping for the company; Bradshaw was the sole signer on the company's bank account and was listed as "president" on the account documents (a fact Bradshaw could not explain); Bradshaw's wife opened the credit card account for the company; and Bradshaw financed Gonzalez's

efforts to obtain a contractor's license. Whether this evidence could support inferences different from the ones drawn by the trial court is immaterial, as "this court is without power to substitute its own inferences or deductions for those of the trier of fact." (*Estate of O'Connor*, *supra*, 16 Cal.App.5th at pp. 163–164.)[23]

### *Bradshaw's Loans to Bay Construction*

Bradshaw argues that the trial court erred in finding his loans to Bay Construction gave him a "significant interest" in the company and "[o]n that basis," finding Bradshaw breached the trust. He first contends that "even [Coleman] concedes that if Gonzalez is lying," the loans alone would not give rise to a breach of duty, and, since Gonzalez "cannot be trusted," Coleman "agrees there is not enough evidence to support a breach of trust.

There are several problems with this argument. One is that it ignores our standard of review: As we have explained, the trial court did not believe Gonzalez was lying and we cannot second-guess that credibility determination. Another is that the "concession" Bradshaw points to was expressly *not* in reference to the loans. The court had asked Coleman's attorney when certain evidence *not including the loan* would be enough to establish Bradshaw's ownership or interest in Bay Construction, and counsel responded, "[w]ithout the testimony of Mr. Gonzalez, maybe not."[24]

---

[23] Bradshaw's repeated references to the Review Department's rejection of facts the trial court here accepted is entirely inappropriate. As earlier noted, we denied Bradshaw's request for judicial notice of the Review Department's opinion.

[24] Counsel had argued there was "credible evidence from Gonzalez" that Gonzalez and Bradshaw had a "partnership agreement," and that Gonzalez's interpretation was supported by evidence including Bradshaw allowing Bay Construction to operate out of his law office, providing his secretary to work for Bay Construction, risking his wife's credit by obtaining credit cards for

Further, the court did not find the loans alone would be sufficient to find a breach of duty. The loans were one aspect of the court's finding that Bradshaw had a "substantial interest" in Bay Construction: He "was an unsecured creditor of Bay Construction and the company owed him tens of thousands of dollars" *and* he "was also a company principal. He maintained significant control over the company, its resources, its employees and the work it did. He set Bay Construction's prices and controlled cash flow. Bay Construction's operations were substantially intertwined with the operations of Bradshaw's other business, his law firm." And Bradshaw's substantial interest was not the sole basis for the court's conclusion that he breached the trust. The court emphasized that its decision was based on "the totality of circumstances. The court does not find that each circumstance—Bradshaw's interest in Bay Construction, his control over the company, his control over the company's engagement at the Trust property, the no-bid nature of the engagements, Bradshaw's knowledge that the company lacked credible contractor credentials, the peril at which he put the Trust property, his non-disclosure and his material misrepresentations—considered in isolation is necessarily enough to find a breach of trust. But considered together, the circumstances demonstrate that Bradshaw breached the trust by engaging in self-dealing without due regard for the Trust and in bad faith."

Bradshaw's second argument is that the trial court erred because his expert witness on estate planning, trust and probate law, Albert Handelman, testified that Bradshaw having loaned money to Bay Construction was not a fact he was required to disclose to the court or beneficiaries. This was critical

---

the company, and loaning money to the company. The court asked, "*before you got to the loan*, would that be enough?" Counsel responded, "Without the testimony of Mr. Gonzalez, maybe not. But I think that supports the testimony that Mr. Gonzalez gave."

evidence that Bradshaw did not breach the trust, he maintains, because Coleman stipulated that the claimed breach of trust was based not on the fact that Bradshaw had an interest in Bay Construction but on his failure to disclose that interest.

The expert opinion Bradshaw relies on, however, was given in response to a hypothetical based on the facts as Bradshaw sees them, not as the trial court found them. Handelman testified that no disclosure would have been required assuming Bradshaw "was acting as trustee for Ms. Gosey, and had an attorney-client relationship with Juan Gonzalez, the sole shareholder of Bay Construction, was the incorporator for Bay Construction, was the sole signer on the Bay Construction checking account, asked my wife to open up an Amex account for the use of Bay Construction and its employee and other helpers, and loaned money to Bay Construction during the period of its operation, and, also, paid off the final Amex bills for which my wife was liable after Bay Construction ceased operations." Handelman was not asked, and offered no opinion, whether disclosure would have been required if the assumed circumstances included that Bradshaw was a principal of Bay Construction and/or controlled its business operations and finances.[25]

---

[25] Bradshaw adds that both Handelman and Robello (Bradshaw's probate attorney) testified Bradshaw made all required disclosures. Absent any indication this testimony took into account all the circumstances the trial court found relevant, it is of little moment. For example, Robello testified that when she prepared the third accounting that was sent to the beneficiaries after Gosey's death, "given all the information that [she] had at the time," she did not disclose that Bradshaw had an "affiliate relationship with any entity [he] owned or controlled" or "had an affiliate or familial relationship with any entity hired" during the accounting period because she "didn't believe that there was anything to disclose at that time." Since Bradshaw disclaimed any interest in or control over Bay Construction, the information Robello was acting on was not consistent with the facts the trial court found true.

*Bay Construction's License*

Bradshaw contends there was no evidence Bay Construction lacked a credible contractor's license and, therefore, the trial court erred in finding he did not give due regard to the trust when he hired Bay Construction. In Bradshaw's view, uncontroverted evidence shows Bay Construction held a valid license issued by the CSLB,[26] and the court's finding that Bradshaw jeopardized the safety of Gosey's home and its occupants by hiring Bay Construction is "wholly outside the evidence, in direct conflict with the evidence and constitutes reversible error" because the parties stipulated that the work Bay Construction did on the property was of professional quality.

Bradshaw's reliance on the fact that CSLB issued the license to Bay Construction misunderstands the court's findings and analysis. The license was issued through a procedure that depends upon the involvement of the RMO whose license qualifies the applicant for licensing. Pursuant to Business and Professions Code section 7068, subdivision (a), "The board shall require an applicant to show the degree of knowledge and experience in the classification applied for, and the general knowledge of the building, safety, health, and lien laws of the state and of the administrative principles of the contracting business that the board deems necessary for the safety and protection of the public." A corporation "shall qualify by the appearance of a responsible managing officer or responsible managing employee who is qualified for the same license classification as the classification being applied

---

[26] In support of this assertion, Bradshaw cites his own declaration stating, "Under information and belief, the Bay Construction, Inc.'s contractor license number is 999481. It is my understanding, based on a review of the California Contractor's License Board website's listing for Bay Construction's license, that Bay Construction received its license on December 22, 2014. It is my understanding that Bay Construction's license was rendered inactive in January 2016."

for." (Bus. & Prof. Code, § 7068, subd. (b)(3).) The person qualifying on behalf of a corporation "shall be responsible for exercising supervision and control of their employer's or principal's construction operations to secure compliance with this chapter and the rules and regulations of the board." (Bus. & Prof. Code, § 7068.1, subd. (a).)[27] "Direct supervision and control" means "supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites." (Former Cal. Code Regs., tit. 16, § 823, subd. (b); Bus. & Prof. Code, § 7068.1, subd. (c)(4).)[28]

The trial court concluded Bay Construction's license was invalid because the RMO, Invernon, "never supervised Gonzalez or played any role in Bay Construction's operations." This finding is supported by Gonzalez's testimony that he never spoke with Invernon. The trial court clearly believed this testimony, and no evidence in the record contradicts it.

Although Bradshaw argues to the contrary, the evidence also supports the trial court's conclusion that he knew Bay Construction did not have a valid license. Gonzalez testified that Invernon was "the person who loaned their license" and that Bradshaw told him "he was looking for someone and this man offered a discount if he was paid in advance for the year and that's the way that the license was acquired." He further testified that he did not

---

[27] Business and Professions Code section 7068.1 was amended effective January 1, 2022. (Stats. 2021, ch. 376, § 6.) The text quotes the version of the statute in effect at all times relevant to the present case.

[28] Section 823 of the California Code of Regulations was repealed in 2022. The same definition of "direct supervision and control," with minor changes in wording, now appears in Business and Professions Code section 7068.1, subdivision (c)(4).

call Ja-Set as Bradshaw directed in his letter informing Gonzalez that Invernon had agreed to act as RMO for Bay Construction, and that Bradshaw made the arrangements and paid Invernon. The only documented contacts with Invernon are by Bradshaw: the check from Bradshaw's law firm and payments indicated on Bradshaw's client accounting, and Bradshaw's January 2016 letter to Invernon informing him that Bay Construction was discontinuing operations. Bradshaw certainly was aware of the supervision requirements for a valid license under the auspices of an RMO, as he described them in the letter informing Gonzalez that Invernon had agreed to act as RMO. Given the degree of Bradshaw's involvement in the operations of Bay Construction shown by the evidence, once the trial court accepted Gonzalez's testimony that he never spoke with Invernon, the only reasonable inference is that Bradshaw was aware Invernon was not playing the active supervisory role required for a valid license. Deferring to the trial court's credibility determinations and reasonable inferences, as we must, the evidence was sufficient.

Contrary to Bradshaw's arguments, the trial court's findings were not undermined by the parties' stipulation that Bay Construction's work at the trust property was of professional quality. Bradshaw contends that due to this stipulation, the parties did not have notice or an opportunity to be heard on the credibility of Bay Construction's license. The stipulation was simply that Bay Construction's work at the trust property was of professional quality and billed and paid for at fair market value. As these are entirely separate issues from whether the company's license was valid, it is difficult to see how the stipulation could have removed the licensing issue from the case.

Nor does the stipulation undermine the court's finding that Bradshaw put the trust property at risk by hiring Bay Construction. Bradshaw's claim

that if the work was of professional quality, "it naturally follows the work did not put the house and its occupants at risk," again misunderstands the trial court's analysis and conclusion. The court was addressing the risk Bradshaw took in hiring Bay Construction, not the outcome. " 'The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.]' " (*Montgomery Sansome LP v. Rezai* (2012) 204 Cal.App.4th 786, 793–794, quoting *Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995; Bus. & Prof. Code, § 7000.6 ["Protection of the public shall be the highest priority for the Contractors State License Board in exercising its licensing, regulatory, and disciplinary functions. Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount"].) It follows that hiring a contractor without a valid license carries more risk than hiring a properly licensed contractor. The trial court's point was that repeatedly hiring a company without a valid license exposed the trust property to greater *potential* risk than hiring a company with a valid license.[29]

---

[29] Bradshaw points out that the State Bar Review Department concluded there was insufficient evidence to support the State Bar Court judge's finding that Bradshaw knew Invernon was not supervising construction on the trust property, and argues "[t]hat is true" here as well. The State Bar proceedings and decisions are not before us and, in any case, not a basis for rejecting the trial court's determinations.

Bradshaw complains that, based upon the stipulation, the trial court told him he did not need to call the construction expert who testified at the State Bar trial. According to Bradshaw, this expert, Pat Kelly, testified not only that Bay Construction's work was of professional quality and fair price but that the work was "excellent," that whether a contractor is licensed has no bearing on the quality of the work he or she performs, and that an RMO is not required to provide on-site supervision. Bradshaw maintains this testimony would have negated the trial court's conclusion that Bradshaw put the trust property at risk.

We are not convinced Bradshaw was prejudiced by the absence of Kelly's testimony. Bradshaw's description of the testimony Kelly would have given did not change the court's assessment when Bradshaw made the same argument in his objections to the court's tentative decision and motion for a new trial. Since the court was concerned about the trust's exposure to risk, an after-the fact opinion that Bay Construction did "excellent" work was beside the point. Bradshaw knew Gonzalez was unable to obtain a license based on his own qualifications and arranged for the company to obtain a license under the auspices of an RMO he knew was not providing the required supervision, effectively flouting the need for a contractor's license. The fact that a unlicensed contractor might do excellent work on a particular project does not undermine the value of licensing statutes in protecting the general public. Testimony that an RMO need not be present on site would address only one of the means by which the supervision requirement may be met; it would not undermine the reasonableness of an inference that an RMO who never spoke with Gonzalez could not have been exercising direct

40

supervision and control over the work Gonzalez was performing on the trust property.[30]

### *Competitive Bids*

Bradshaw also challenges the court's finding that he breached his duty to the trust by repeatedly hiring Bay Construction without obtaining competitive bids. His primary argument seems to be that no expert evidence contradicted his expert's testimony that it was "within the standard of care for a trustee to use the same vendor repeatedly where their experience shows they get proper work and a fair price for the job performed."

The testimony Bradshaw refers to was not addressing the issue of competitive bids. The court, questioning Handelman about whether the opinions he gave in response to Bradshaw's hypotheticals differ if he added specified facts, asked Handelman to assume that Bay Construction's contracting license was conditioned on "supervisorial or directory participation in projects by an outside licensed contractor," and "no outside licensed contractor played any role in the work done at that subject property." Handelman replied that he would want additional information about the trustee's understanding and type of building permit, but testified, "if I'm a trustee, and I'm hiring somebody who I know is not licensed or otherwise properly operating, and I have clear information to that effect, it would be dubious maybe for me to do it, I guess." He then noted that sometimes "you can do something that's not the best step forward, but it doesn't harm

---

[30] As earlier noted, "direct supervision and control" can include "supervising construction," "managing construction activities by making technical and administrative decisions," or "checking jobs for proper workmanship," as well as "direct supervision on construction job sites." (Former Cal. Code Regs., tit. 16, § 823, subd. (b); Bus. & Prof. Code, § 7068.1, subd. (c)(4).)

anybody. In fact, the person does a good job, and they charge a reasonable fee, and everybody is happy, other than maybe the Contractors' State License Board."

At this point, the court asked, "So . . . it does or doesn't affect your opinions on whether duties were satisfied?" Handelman replied, "It doesn't. I think that—I would think that a trustee that worked with somebody for a long time, that knew their work, would probably be thinking first and foremost about that." Handelman said he would also want to know whether the trustee knew the unlicensed person was going to begin work "not under an owner/builder permit" and believed "no steps were being taken to change the unlicensed circumstance," and the court told him to assume this was the case. Handelman testified, "if they knew they are just using someone who is unlicensed, I would say that's improper. . . . [I]f I'm thinking of 16040 in the Probate Code,[31] I think a careful, skillful, cautious, prudent person administering a similar trust would probably want to know that they are dealing with somebody that they were going to have some recourse against, because, in part, because they are licensed. . . . If they knew all those problems existed and did nothing about it, yes, that might not meet the standard of care at that point."

It is evident from the above that Handelman did not directly address any question about the standard of care for a trustee with respect to bids for work on trust property. His comment about a trustee thinking about his

---

[31] Subdivision (a) of Probate Code section 16040 provides: "The trustee shall administer the trust with reasonable care, skill, and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument."

familiarity with a contractor's work over a period of time related to the trustee's standard of care with respect to the licensing question, not whether competitive bids were needed or advisable.

Bradshaw also argues that there was no evidence he did not seek competitive bids, and that he testified he got estimates from other companies for some of the repairs.[32] When asked if he ever obtained bids from contractors other than Bay Construction, Bradshaw replied, "No," and explained that he had personal experience building and remodeling and had "a sense of what things cost." He then clarified that he sometimes tried to get multiple bids: He called six or seven companies about the stair repair at the trust property, but none returned his call, and when a damaged pipe was discovered after Gosey's death, he called 10 plumbers, three came to look and none offered a bid. Asked, "didn't you steer all the work from the Gosey house to Bay Construction," Bradshaw testified, "[n]ot out of intent" and said Gonzalez would "take my call at 3:00 in the morning" or on Christmas, while other contractors he called did not call him back. Asked about having a vested interest in ensuring the company earned money to repay his loans, Bradshaw testified that Bay Construction turned down better paying larger jobs because of work it was doing for the trust property.

The trial court found that Bradshaw "engaged in no meaningful efforts to obtain bids from other contractors" and, "with minor exceptions, all work performed at the Trust Property during Bradshaw's tenure as trustee was performed by Bay Construction based on prices set by Bradshaw and all work

_____

[32] Bradshaw cites page 227 of the reporter's transcript for March 15, 2019. As we previously observed (fn. 5, *ante*), the transcript for March 15 ends on page 161. As with the earlier incorrect citation to the March 15 transcript, in the only volume of the reporter's transcript that has a page 227, that page does not concern Bradshaw's efforts regarding bids.

was invoiced through Bradshaw." As we have seen, the trial court did not think highly of Bradshaw's credibility, and it was not required to accept his testimony that none of the contractors he contacted returned his calls or were interested in the work.

Moreover, Bradshaw's continued effort to view each factor the court relied upon in isolation distorts the court's analysis. The court did not find a breach of trust based solely on its conclusion that Bradshaw failed to obtain competitive bids. Its judgment was based on this failure in combination with Bradshaw's financial interest in Bay Construction, control over its operations, knowledge that the company was not properly licensed, and misrepresentations about or failure to disclose these facts to the court, Gosey, and/or the beneficiaries.

### Bad Faith

Bradshaw argues the evidence does not support the trial court's finding of bad faith for two reasons: First, the finding is based on the factors discussed above, which Bradshaw maintains are unsupported by the evidence or "contrary to the great weight of evidence; and, second, Bradshaw's expert, Handelman, "confirmed Bradshaw did not act in bad faith."

Bradshaw's first point requires little comment. Having rejected Bradshaw's challenges to the sufficiency of the evidence supporting the individual factors the court relied upon, we necessarily reject the suggestion that the bad faith finding must be reversed because it was based on these factors. The trial court found Bradshaw acted in bad faith based on the totality of a number of circumstances, as discussed above: Bradshaw's role in and control over Bay Construction, his financial interest in repayment of his loans to the company, his knowledge of Bay Construction's lack of a valid contractor's knowledge, his repeated hiring of Bay Construction to work on

44

the trust property without obtaining other bids for the work, and his misrepresentations and omissions to the court, Gosey, and the beneficiaries.

Bradshaw's reliance upon Handelman's testimony is also unavailing. Bradshaw quotes at length from Handelman's testimony that he did not see anything in the materials he reviewed indicating that any of Bradshaw's acts as trustee were done in bad faith, and discussing the factors he considered in concluding Bradshaw was "concerned first and foremost with the trust and its beneficiaries, and . . . prioritizing the beneficiary, Ms. Gosey."[33]

Bradshaw does not mention, however, Handelman's qualification immediately after saying he had not seen anything to indicate bad faith: "Although, I just want to say, I think ultimately that conclusion is really the court's conclusion, and it involves looking into the mind of the trustee, in a way. And that is something that the court can discern, because the judge here is going to hear a lot more about this case than I am." As described above, when asked to go beyond the facts Bradshaw posited and assume those the trial court found true, Handelman was more inclined to see the

---

[33] Handelman testified that he considered Gosey's expressed desire to remain in her home, the trust provisions allowing the trustee to borrow for the benefit of the trust, and the fact that Bradshaw retained a certified specialist to "walk him . . . through the administration process," which was appropriate because it was outside Bradshaw's primary area of practice. He also considered the fact that Gosey was able to stay in the home almost until her death and did not have any accidents while living there, the reports detailing the work done on the property, and the court investigator's report concluding that Bradshaw was "doing a good job for the benefit of Ms. Gosey," and the reverse mortgage request was appropriate. Handelman opined that Bradshaw was "concerned first and foremost with the trust and its beneficiaries, and . . . prioritizing the beneficiary, Ms. Gosey." Regarding Bradshaw's voluntary deferral of fees in order to keep liquidity in the trust to ensure Gosey "could be properly taken care of for the rest of her life," Handelman testified he had never before seen a trustee do this.

conduct as improper. The court observed in its statement of decision that it "understands respondent's expert Albert Handelman to agree that facts that align with those discussed herein support a finding that the trustee breached his duty of loyalty and duty to avoid self-dealing, even considering the limitations on those duties set out in Paragraph VII(B)(5). Also, notably, Mr. Handelman declined to give an opinion whether Mr. Bradshaw acted in bad faith, saying that was an issue for the court. The court has resolved the issue finding that Mr. Bradshaw acted in bad faith."

### *Removing Bradshaw as Trustee Was Not an Abuse of Discretion*

Bradshaw's final argument is that the trial court abused its discretion in removing him as trustee without a showing of harm to the trust. Although a trustee may be removed where he or she "has committed a breach of trust" (Prob. Code, § 15642, subd. (b)(1)), Bradshaw argues the burden for removal is higher where the trustee "was a successor trustee named in the trust by the settlor."

Bradshaw's argument that the trial court did not apply the correct standard is based on the following quotation from *Copley v. Copley* (1981) 126 Cal.App.3d 248, 286–287 (*Copley*): "When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove that trustee, and it will never remove him for potential conflict of interest but only for demonstrated abuse of power detrimental to the trust. [Citations.] In *Estate of Brown* [(1937)] 22 Cal.App.2d 480, the court said that the settlor's named trustee will be removed only for extreme grounds, such as incapacity, dishonesty, or lack of the qualifications necessary to administer the trust. ([*Id.* at p.] 486.) In *Estate of Keyston* [(1951)] 102 Cal.App.2d 223, the court declined to remove the trustee, even though the entire corpus of the trust was closely-held stock

in a corporation of which the trustee was shareholder and salaried president; the decedent trustor, said the court, was aware of this conflict, and no actual dishonesty was alleged. So here. No actual dishonesty or obvious abuse exists; the conflict consists of relationships known to the settlor and expressly sanctioned by her. The trial court acted correctly in refusing to remove the trustees." (*Estate of Gilliland* (1977) 73 Cal.App.3d 515, 528.)" (*Copley*, *supra*, 126 Cal.App.3d at pp. 286–287.)

The premise of the rule stated in *Copley* is that the settlor's choice of trustee *despite awareness of a conflict* should prevail absent extreme circumstances. Here, when Gosey executed the trust instrument naming Bradshaw as a successor trustee in 2007, she could not have known of or foreseen Bradshaw's interest in and control over Bay Construction—the company was not formed until 2014. Nor is there any evidence Gosey was aware of Bradshaw's relationship with Bay Construction later; how could she have, when Bradshaw insisted no such relationship existed? Furthermore, the trial court found Bradshaw was dishonest on material matters and, as the court noted, trustee dishonesty satisfies the standard discussed in *Copley*.

The trial court observed that "the trial made plain that Bradshaw sees nothing wrong in his actions. A reasonable inference is that actions inconsistent with the most basic trustee duties would continue." Bradshaw has not demonstrated the court abused its discretion in removing him as trustee.

## DISPOSITION

The judgment is affirmed.

_____
Mayfield, J.*

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

*Coleman v. Bradshaw* (A157968)

     \* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.